The next case for argument is 24-1199, In Re International Insulation Products. Mr. Habib, whenever you're ready. Good morning, Your Honor. Good morning. Good morning, Your Honor. Jeff Habib, Counsel for Appellant. May it please the Court. This is a patent case. And the issue is whether a waterproof propylene film qualifies as a synthetic roofing underlayment that is explicitly recited in Claim 1. The specification describes synthetic roofing underlayment. And so the description in the specification can be used to determine whether or not the film qualifies as a synthetic roofing underlayment. In the specification, it calls out that roofing underlayment is placed between a roof deck and roofing material. The underlayment protects the roof deck from water that penetrates the roofing material. In real life, a very common application is plywood sheathing as a roof deck with shingles being applied over that sheathing as the roofing material. Well, given that time is limited and we really have read all the materials, let me just ask you one thing that just a question popped up. You think the claim term synthetic roofing underlayment carries with it all these extra requirements, fasteners and concerning placement. Let me just finish the question so you can tell me. And the claim itself doesn't mention any of those explicitly. Why didn't you amend your claim? You had the opportunity to amend your claim right to include that at this juncture of the case. That may have changed what was going on here. Perhaps. However, we are not reading limitations into the claim. Synthetic roofing underlayment is expressly recited as a limitation. Yeah, but you're talking about fasteners and all these other things in your arguments which don't appear in the claim itself. So I'm just wondering if that was the rub here and arguably led to, you know, affected the result, why you didn't amend your claim. I think it's a misunderstanding that describing how a synthetic roofing underlayment is used in real life to express the physical qualities that a synthetic roofing underlayment must have. For example, it is often with shingles. You nail the shingles. So a roofing underlayment is often used in an environment where there's fasteners. The claimed synthetic roofing underlayment, or excuse me, the claimed roofing underlayment can be infringed when the roofing underlayment is in the warehouse. We're not saying it must be installed to be infringing. The key quality that distinguishes this roofing underlayment from the prior art is that the one layer is a synthetic roofing underlayment. Synthetic roofing underlayments are conventional. We point out in the specification examples of commercially available synthetic roofing underlayments. So, Counselor, doesn't Krostic disclose the second layer, that it also includes an outer plastic surface as property, the plastic? Krostic discloses it as the second layer, the second outer layer, a vapor barrier. Not a roofing underlayment, a vapor barrier. Polypropylene films are often used as a vapor barrier to prevent water vapor from going from between a warm side to a cold side of an environment. The Krostic roofing, Krostic reflective insulation is used to divide an interior into a warm side and a cooler side. So the vapor barrier prevents that moisture migration from the warm side to the cool side. And would you agree that these are all factors that a person that's skilled in the art would know? Yes. These materials have been used for many, many years in the roofing and construction industry. Can I ask you a question about just one of what I think is one of your arguments, and I don't really understand it, which is I think the motivation to combine where you argue that you wouldn't have been motivated to combine Krostic with Hamdar, those are the two references you're talking about, because Krostic already had waterproofing, was waterproof. How does that help you? I mean, that says, no, this is anticipation and not obviousness. How does that help you? The reason is in the office action, in the final office action, the examiner combined Krostic with the Hamdar waterproofing membrane. Hamdar discloses a polyethylene film that functions as a carrier sheet. In Krostic figure three, you see that as item 22. And it adheres to a waterproofing membrane, 24. So when we read the final rejection, combining Krostic with Hamdar's waterproofing membrane, we assume that he's including the membrane. In the examiner's answer, he says, no, that's the wrong interpretation. It's just that Hamdar teaches a waterproof polypropylene film. So he's now stripped the film away from the waterproofing membrane and says the polypropylene film alone is waterproof. But we agree it's waterproof. But that does not disclose that a waterproof polypropylene film can function as a synthetic roofing underlayment. When, for example, sandwiched between roofing material and roof deck with the possibility of fasteners, there's been no showing that a waterproof polyester film alone can function as a synthetic roofing underlayment. As a matter of fact, if it did, why would Hamdar have a waterproofing membrane adhering to that polyester film? So our response was to the combination of a polyester film with a waterproofing membrane, adding the waterproofing membrane to Krostic. That's how we read the final rejection. So if it was waterproof, you don't have to add the waterproofing membrane. How does all of that add up to no substantial evidence for motivation to combine Hamdar and Krostic? Because the initial rejection, it was our belief that the examiner was combining a waterproofing membrane with the polyethylene film of Krostic. Adding a waterproofing membrane, which in Hamdar is a separate component adhering to the polypropylene film. I may just say plastic film. It's easier. So we were pointing out in response to the final rejection that it was already waterproof. There was no need to add a waterproofing membrane as disclosed in Hamdar as a separate additional component. But in the examiner's answer, he's now stripped away the membrane and is relying on a waterproof polyplastic film alone to function as a roofing underlayment. But as it provided no evidence, no examples where a plastic film alone functions in an environment of a roofing underlayment. It is known to include plastic films in a roofing underlayment. But not a, as far as we know, not to use a plastic film alone as a roofing underlayment between roofing materials and a roof deck. If it can't function in that environment, you know, roofing, my shingles are 20 years old. They're going to be replaced soon, but they're 20 years old. And that roofing underlayment is going to be there for 20 years. So again, there's certain characteristics of a roofing underlayment that are described in the specification. And again, those, that description in the specification can be referred to when evaluating what the synthetic roofing underlayment of Claim 1 is. Again, we're not reading the limitations from the specification into the claim. The claim explicitly recites synthetic roofing underlayment that is described in the specification. Its use, and the fact that it's, for example, made of synthetic fibers, and that, and so we've described what a synthetic roofing underlayment is to give definition to the term in the claim itself of synthetic roofing underlayment. Okay. You're into your rebuttal, so why don't we hear from the governor and we'll reserve the rest of your time. Thank you. Thank you.  May it please the court, Fahad Patel with the USPTO. I'll try and be brief. I want to respond to some of the arguments. The first point, actually, just to bring up is that a council focused on the claim limitation synthetic roofing underlayment. Now, we had a forfeiture argument in our brief, and it's because before the board, IAP did not actually argue that limitation in its appeal brief to the board. So I can just give you the site briefly, but it's on Appendix 305, which is IAP's appeal brief to the board. And the argument there was simply this interior-exterior argument that the claimed use is outside exterior, whereas the reference has interior use. So the interior-exterior argument is what they argued before the board, and the board addressed that argument. So the sort of shift in arguments is a forfeiture, is what we've argued. So that's sort of one point I wanted to start with. The second point is kind of focusing more on the panel's questioning to my friend, and it's about whether the claim actually requires any of these features like a placement or fasteners or self-sealing. So none of that is in the claim language, and it doesn't limit the scope of the claim. I think actually there was an admission that I heard, which I think makes the point, which was that a product embodying the claim as written can infringe sitting in a warehouse. I believe that's what my friend said. So if that's the scope of the claim, it can infringe sitting in a warehouse not located between shingles and the roofing panel, not having fasteners, not having self-sealing. If it can infringe that way, then it can be invalidated by prior art of the same scope, essentially. So in other words, a prior art need not have fasteners, self-healing membrane. But the other argument is that the claim language doesn't include that. It doesn't include that. I think that's exemplified by that admission. So the claim language says nothing about any of these features. It's a composition claim. It's just three layers. One layer is waterproof on one side. On the other side, there's a reflective layer, and in the middle, there's an insulating layer, and there's adhesives. That's basically what the claim covers. The claim doesn't say anything about fasteners or a placement or anything like that. So that's sort of the rebuttal. So I don't fully understand what they're saying actually is limiting to the claim, if it could infringe sitting in a warehouse. Well, it looks like one of his arguments is that there's a limitation in the placement of the membrane. I believe that they're arguing that the underlayment has to be, well, at least in front of the board, IAP argued that the underlayment has to be exterior. It has to be outside on top of the roof of a house, and that's apparently a limitation of the claim, according to IAP. So the main argument is that the claim doesn't require any specific placement of the underlayment. It doesn't require that it be outside, and even if it was outside, that would just be like an intended use of really a composition, almost like an apparatus intended use that doesn't actually limit what the claim requires, because the claim is just the layers. It's the composition. It's what is in the roofing underlayment, not where you put it or how you attach it to something. So the claim doesn't require this exterior placement. Do you talk about, I think he's appealing to finding a motivation to combine HOMDAR and CROSTIC, or at least whether there be a reasonable expectation of success. If we don't read admissions into what has been said by the applicant, how would we find substantial evidence to support what the board did nonetheless? So the board's combination, if you set aside the admissions about the waterproofing of CROSTIC, then all the examiner and the board did was they looked at CROSTIC. They said, okay, CROSTIC has this propylene layer already, and the claim requires that the synthetic roofing underlayment be waterproof. So the question becomes, would CROSTIC's propylene layer be waterproof? So the only thing that the examiner and the board took from HOMDAR was this idea that propylene can be waterproof. It didn't take the whole layer from HOMDAR and try to incorporate the layer from HOMDAR into CROSTIC. It just merely took the characteristic of propylene being waterproof as something that would have been obvious to a person of skill. That's sort of the extent of their reliance on HOMDAR. And the finding as to motivation with a reasonable expectation of success, what did the board say? So the board, it should be on appendix four, and the examiner said this too. It was for mold formation. So what the examiner said is that it would have been obvious to make CROSTIC's propylene layer waterproof to prevent mold from entering the insulation layer and forming. That was the reason. Thank you. Thank you. Okay, Mr. Habeeb, you have some rebuttal time left. May it please the court. Again, the purpose of discussing the uses of a synthetic roofing underlayment is to demonstrate the properties it must exhibit to exist as a synthetic roofing underlayment during use. We don't care if you use it for something else, if you use it to cover your car, whatever. But it's a synthetic roofing underlayment, it has to function in that environment. The examiner has not proven that a polyester film by itself, waterproof, not waterproof, can function as a synthetic roofing underlayment in the environment that a person of ordinary skill would understand a roofing underlayment would function. The reason it's important to understand that the examiner has only shown interior uses is because it does not evidence that this CROSTIC insulation can be used in an external environment to function as a roofing underlayment. It's really that simple. And it should be understood, too, that when the appeal brief was filed with the board, at that point we believed that the combination was Hamdar's waterproofing membrane being added to the plastic film. It was only in the examiner's answer that he said, no, we're using the teaching of Hamdar to make the film waterproof, not to add the membrane. Again, you've ripped the membrane away from the film. That membrane must have been important to be a roofing underlayment. It was included in Hamdar, but now it's been ripped away. And we're now saying that the film alone, which was being used in Hamdar to provide a friction, a skid-resistant upper surface so you could walk on it without slipping. That's all. So there's been absolutely no evidence given by the examiner that CROSTIC, waterproof or not waterproof, waterproof film or not waterproof film, can function in an external, exterior environment as a synthetic roofing underlayment between roofing material and roof deck. That simply hasn't been demonstrated at all. And those limitations, if I could quote MPEP 2111, there's a difference between reading a claim in light of the specification to thereby interpret limitations explicitly recited in the claim. It's quite different from reading limitations into the claim to thereby narrow the scope. We're not doing that. The limitation of a synthetic roofing underlayment is explicitly recited in the claim. We can therefore go to the specification to flesh out what synthetic roofing underlayment is and how it can function.